**ALL AIRE CONDITIONING, INC.; et al., Plaintiffs,**

v.

**The CITY OF NEW YORK, et al., Defendants.**

**HENICK–LANE, INC., Plaintiff,**

v.

**The CITY OF NEW YORK, et al., Defendants.**

Nos. 93 CIV. 4718(LAK), 96 CIV. 9483(LAK).

United States District Court, S.D. New York.

Sept. 30, 1997.

Melvyn R. Leventhal, Marjorie E. Berman, Leventhal & Slade, New York City, for Plaintiffs.

Ave Maria Brennan, Tahirih M. Sadrieh, Corporation Counsel, New York City, for Defendants.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Parking space on the streets of Manhattan is among the scarcest of commodities. It is of special importance to the owners of commercial vehicles used to make deliveries or to respond to service calls, especially those whose vehicles are used to bring heavy or bulky packages or equipment to their customers' premises.

The City has sought to accommodate the needs of such enterprises by permitting temporary parking for expeditious loading, unloading and service calls in areas in which parking otherwise is restricted. Nevertheless, plaintiffs contend that the policies and guidelines used by various City agencies in determining when to ticket vehicles parked in these areas are unconstitutional because they result in the issuance to them of large numbers of summonses which ultimately are dismissed, but which must be defended at considerable cost and inconvenience.

The defendants (collectively, the "City") move for summary judgment dismissing the complaints in both of these actions. Plaintiffs move for partial summary judgment on certain of their claims.

*Facts*

*Plaintiffs*

Plaintiffs are businesses engaged primarily in installing, maintaining and repairing heating, air-conditioning and ventilation systems throughout New York City. Because their repair equipment and spare parts can weigh as much as 300 pounds, plaintiffs rely on curbside parking spaces near customer locations to conduct their business. Perhaps not surprisingly, plaintiffs have received a large number of parking summonses over the last several years. They have spent a good deal of time and money defending against them and assert that approximately 85 percent of the tickets received ultimately were dismissed.

In order to place plaintiffs' claims in context, it is essential to understand both the relevant parking regulations and the means by which they are enforced.

*The Pertinent Parking Regulations*

Plaintiffs' challenge turns on the enforcement of parking regulations against commercial vehicles in two basic circumstances.

First, the City permits parking for certain limited commercial purposes in two types of otherwise restricted zones (collectively, "CD" zones). The first is designated by signs stating "No Standing Except Trucks Loading and Unloading" ("No SETLU" zones) and is governed by Section 4–08(k)(2) of the New York City Traffic Rules and Regulations (the "Rules"), which permits commercial vehicles to park in a No SETLU zone "for the purpose of expeditiously making pickups; deliveries or service calls."[1] The second is designated by familiar "No Parking" signs ("No Parking" zones) and is governed by Section 4–08(a)(4) of the Rules. Section 4–08(a)(4) allows commercial vehicles to park in No Parking Zones "temporarily for the purpose of and while expeditiously ... loading or unloading property to or from the curb."[2]

Second, Section 4–08(k)(6) of the Rules excludes "vehicles owned or operated by gas or oil heat suppliers or gas or oil heat system maintenance companies, the agents or employees thereof, or any public utility" from a

---

1. Brennan Aff. Ex. 1.

2. *Id.* Ex. G.

prohibition against the parking of commercial vehicles in residential areas between 9 p.m. and 5 a.m.

*Enforcement Agencies and their Practices*

Parking tickets are issued in New York City by civilian Traffic Enforcement Agents and Parking Control Specialists (collectively "TEA"s) and New York City police officers. The TEAs were employed and supervised by the New York City Department of Transportation until August 8, 1996, when they were shifted to the jurisdiction of the New York City Police Department.

*Enforcement Policies in CD Zones*

At least prior to the changeover, the two agencies used somewhat different guidelines for their personnel with respect to when tickets should be issued to commercial vehicles parked in CD zones.[3]

The DOT enforced Sections 4–08(k)(2) and 4–08(a)(4) through a "30 minute observation policy." If a TEA saw no sign of activity at a parked vehicle, he or she was to note the time. If the TEA returned more than 30 minutes later and again saw no activity, the TEA was to issue a ticket.[4] The Police Department, on the other hand, instructed its officers to apply "some observation period" to commercial vehicles parked in No SETLU zones. If they observed no activity, they were to make discretionary judgments whether to ticket. They were permitted to ticket commercial vehicles in No Parking zones immediately if no loading or unloading was observed.[5]

*Enforcement Policies Regarding Overnight Parking in Residential Areas*

Although Section 4–08(k)(6) permits overnight parking in residential areas of commercial "vehicles owned or operated by gas or oil heat suppliers or gas or oil heat system maintenance companies, the agents or employees thereof, or any public utility," DOT's policy was to have TEAs ticket all commer-

cial vehicles parked in residential areas during the prohibited hours unless they readily were identifiable as exempt.[6] The Police Department had no stated policy with regard to the Section 4–08(k)(6) exemption.

*Adjudication of Charges*

The Court previously has described the procedures by which the charges of illegal parking made in parking tickets are disposed of.[7] If·the recipient of a ticket pleads guilty, the recipient mails the ticket with a check for the fine to the City's Parking Violations Bureau ("PVB"). If the recipient pleads not guilty, the recipient is entitled to a hearing before a PVB administrative law judge ("ALJ"). If the charges are sustained, the defendant, within 30 days of the adverse determination and after paying the fine or posting a bond, may appeal to the Appeals Board of the PVB. An appellant, moreover, is required to attach proof of payment of the fine to its notice of appeal. In the event the charge is dismissed, the fine previously collected is offset against any outstanding summonses to the appellant, with the excess being returned to the appellant.[8]

In deciding whether to uphold a summons issued under either Sections 4–08(k)(2) or 4–08(a)(4), the PVB applies a system of affirmative defenses. If evidence of commercial activity is presented, the ticket is dismissed, regardless of the time that the activity took to complete. In making this determination, the PVB inspects all of the credible evidence presented.[9]

Those ticketed for overnight parking in residential areas may schedule exemption hearings before the PVB. If the vehicle owner establishes that it is an oil or gas supplier or maintenance company, the summons at issue is dismissed and the owner receives a decision that enables it to dispose of future tickets by sending the PVB a copy of the decision along with the summons.[10]

3. The record is silent as to whether this difference in policy has survived the consolidation of the TEAs into the Police Department. Nothing, however, turns on this uncertainty.

4. Primeggia Aff. ¶¶ 13–17.

5. Dey Aff. ¶¶ 57–58.

6. Primeggia Aff. ¶ 21.

7. *C.A.U.T.I.O.N., Ltd. v. City of New York,* 898 F.Supp. 1065, 1067–68 (S.D.N.Y.1995) ("*Caution* ").

8. Phillips Aff. ¶¶ 6–21.

9. Cain Aff. ¶ 33.

10. *Id.* ¶ 39.

*Prior Proceedings*

This litigation has had a long and somewhat tortuous history.

Number 93 Civ. 4718 was commenced by Contractors Against Unfair Taxation Instituted on New Yorkers, a non-profit trade organization whose members included the present plaintiffs. The first amended complaint, which was dismissed by Judge Wood with leave to replead certain contentions, asserted a variety of claims which, for the most part, are no longer part of the case.[11]

The second amended complaint was brought on behalf of C.A.U.T.I.O.N., Ltd., apparently the same entity that filed the suit in the first place, and ten of its members. This Court dismissed the action insofar as it was brought by the trade association, granted in part and denied in part a motion to dismiss the claims of the individual plaintiffs, and granted leave to amend.[12]

At this point, the complaint before the Court in No. 93 Civ. 7318 is plaintiffs' fourth amended complaint, which is essentially the same as the complaint in the *Henick–Lane* action, No. 96 Civ. 9483(LAK). The pleadings at this stage reflect considerable change from their predecessors. They now allege in essence that the City:

1. Routinely issued summonses for vehicles legally parked in CD zones and in residential areas. This is said to have constituted malicious prosecution in violation of plaintiffs' due process rights on the theory that the tickets were issued pursuant to a policy and practice of the City.

2. Persistently seized and towed vehicles that were legally parked in violation of plaintiffs' due process rights.

3. Did not afford plaintiffs fair proceedings before the PVB ALJs in various respects, thus depriving them of due process of law.

4. Improperly conditioned the acceptance of appeals by the PVB on the submission of proof of payment of the fine that was being contested and refused to refund payments made in respect of tickets that were not sustained.

The scope of plaintiffs' case, however, has been narrowed somewhat from that outlined in the pleadings. Now before the Court are defendants' motions for summary judgment dismissing the complaints and plaintiffs' motions for partial summary judgment as to liability on two of their theories. Review of the motion papers and the oral argument makes clear that plaintiffs at this point press only the following claims:

1. The City's policies with respect to the issuance of tickets to commercial vehicles parked in CD zones or parked in residential areas between 9 p.m. and 5 a.m. deprive plaintiffs of due process of law because the policies are void for vagueness as applied.

2. The PVB's policies of requiring proof of payment as a condition of processing an appeal and of applying the credit balance produced by any refund due as a result of a successful appeal of a summons to summonses outstanding on any of the owner's vehicles deprives plaintiffs of property without due process of law. The Court therefore turns to these claims.

*Discussion*

*Ticket Issuance Policies*

It is critically important to focus on just what is and what is not at issue on plaintiffs' claim with respect to the City's ticket issuance policies.

The issuance of a parking ticket is nothing more than an accusation of illegal parking. Only when the vehicle owner pleads or is found guilty after a hearing is the owner fined or otherwise subjected to sanctions. And while plaintiffs at one time asserted that the adjudicative process in the PVB was tainted by unconstitutional practices and policies, they have abandoned that claim.[13] Thus, it is established for purposes of these

---

11. *Contractors Against Unfair Taxation Instituted on New Yorkers v. City of New York*, No. 93 Civ. 4718(KMW), 1994 WL 455553 (S.D.N.Y. Aug.19, 1994).

12. *Caution*, 898 F.Supp. 1065.

13. *E.g.*, Memorandum in Opposition to Defendants' Motion for Summary Judgment, No. 93 Civ. 4718(LAK), at 28 (acquiescing in Point III of defendants' moving brief, which sought summary judgment dismissing the claim that PVB adjudicative procedures violated plaintiffs' procedural due process rights).

motions that plaintiffs receive fair hearings on the charges asserted in the summonses issued to their vehicles and that they are fined only when they plead or, after such hearings, are found guilty. Indeed, plaintiffs assert that up to 85 percent of the summonses issued to their vehicles ultimately are dismissed. The claim therefore is that they are deprived of their rights to due process of law because the City's enforcement policies result in the issuance of too many tickets in circumstances in which the proof ultimately does not bear out the charges of illegal parking. In essence, they contend that the policies or guidelines followed by the TEAs and by police officers are so unsuited to the task of identifying vehicles which in fact are parked illegally that the use of those policies deprives plaintiffs of due process of law even though most of the tickets they receive ultimately are dismissed.

*Due Process: Putative Property Interests*

"In order to sustain an action for deprivation of property without due process of law, a plaintiff must 'first identify a property right, second show that the state has deprived him of that right, and third show that the deprivation was effected without due process.' "[14] The first step in the analysis therefore is to determine whether plaintiffs' obvious practical interest in avoiding the trouble and expense associated with the defense of parking tickets is a property interest protected by the Due Process Clause. Plaintiffs make three arguments.

■ Plaintiffs claim first that they have a property right in their employees' time and that the City's ticketing policies deprives them of that property by compelling them to use the time of the employees to defend parking tickets. But the Court sees no basis for concluding that this is a constitutionally

protected property interest, however significant it may be as a practical matter.

"The existence and dimensions of property interests are defined by 'existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.' "[15] Plaintiffs have failed to identify any state law or other basis for supposing that the state has created an entitlement to having one's time, or that of one's employees, protected against the distractions inherent when one decides to contest one or another government enforcement action. Indeed, it is well established that citizens may be required to bear the costs of defending against lawsuits. " '[T]he expense and annoyance of litigation is "part of the social burden of living under government." ' "[16]

Nor does the volume of summonses at issue here alter this analysis. While it is regrettable if plaintiffs were ticketed in circumstances in which they in fact were legally parked and if the numbers of vehicles and incidents resulted in a substantial expenditure, plaintiffs' interest is no different in principle than that of a citizen who receives a single unjustified ticket.[17] Neither has an entitlement that protects against the loss of time and resources involved in contesting a parking ticket.

The implications of plaintiffs' argument, moreover, are greatly troubling and, if accepted, could work a sea change in American litigation. As a general rule, our system rejects the British "loser-pays" approach to litigation.[18] Recognition of the property interest advocated by plaintiffs would lead to a situation in which litigants who successfully defend against suits brought by the government would be entitled to bring countersuits

---

**14.** *Local 342 v. Town Board of Town of Huntington,* 31 F.3d 1191, 1194 (2d Cir.1994) (quoting *Mehta v. Surles,* 905 F.2d 595, 598 (2d Cir. 1990)).

**15.** *General Elec. Co. v. New York State Dep't of Labor,* 936 F.2d 1448, 1453 (2d Cir.1991) (quoting *Goetz v. Windsor Cent. Sch. Dist.,* 698 F.2d 606, 608 (2d Cir.1983)).

**16.** *FTC v. Standard Oil of California,* 449 U.S. 232, 244, 101 S.Ct. 488, 495, 66 L.Ed.2d 416 (1980) (quoting *Petroleum Exploration, Inc. v.*

*Public Service Comm'n,* 304 U.S. 209, 222, 58 S.Ct. 834, 841, 82 L.Ed. 1294 (1938); *Renegotiation Bd. v. Bannercraft Clothing Co.,* 415 U.S. 1, 24, 94 S.Ct. 1028, 1040, 39 L.Ed.2d 123 (1974)).

**17.** *See In re United States,* 610 F.2d 1148, 1156 (3d Cir.1979) ("gravity of a deprivation is irrelevant to the existence of a property interest as long as the deprivation is not de minimis.").

**18.** *Fogerty v. Fantasy, Inc.,* 510 U.S. 517, 533, 114 S.Ct. 1023, 1033, 127 L.Ed.2d 455 (1994).

for defense costs on the theory that the defense costs were a property interest of which they had been deprived improperly.

Plaintiffs rely on *In re United States of America*,[19] in which the Third Circuit held that call tracing orders that required a telephone company to expend time and money assisting government criminal investigations "denied [the company] the free use of their equipment and of the services of their employees, interests to which they are entitled as basic property ... rights."[20] But the case was fundamentally different from this one. The telephone company there was a non-party which was drafted into government service and forced to bear part of the expense of law enforcement efforts undertaken on behalf of all taxpayers. Here, on the other hand, plaintiffs were accused of wrongdoing in the form of illegal parking. The choice whether to defend against those charges was theirs. If, as they frequently did, they elected to contest the tickets rather than to pay the proverbial two dollars, they voluntarily chose to incur the expense involved. *In re United States* therefore is of little relevance.

▪ Plaintiffs contend next that the City's summons issuance policies deprived them of their protected property right to pursue a lawful private occupation free of unreasonable government interference.[21] Plaintiffs seek support for this position in *Chalmers v. City of Los Angeles*,[22] a case in which the plaintiff faced conflicting city ordinances, one of which allowed her to vend from a push cart under limited circumstances while the other banned such behavior entirely. The Ninth Circuit held that these conflicting ordinances implicated Chalmers' right to pursue her chosen occupation. In contrast, plaintiffs here do not claim that they have been prevented from using CD or other parking spaces.[23] Indeed, plaintiffs could have avoided all tickets by conforming their conduct to the most restrictive of the enforcement policies. To the extent that plaintiffs were deprived of anything, therefore, it was the cost of defending against those of the tickets which plaintiffs succeeded in defeating. Plaintiffs' second asserted property interest thus reduces to a restatement of their first putative interest and, as stated above, is insufficient to support a due process claim.

▪ Finally, plaintiffs argue that the traffic regulations themselves created a property interest in using CD zones and in parking overnight in residential areas.[24] However, as plaintiffs do not allege that they have been denied the use of any parking spaces, no such interest has been infringed.

As plaintiffs have failed to raise a genuine issue of fact as to the deprivation of a constitutionally protected property interest, their claims all must be dismissed.

*Vagueness*

Even if plaintiffs had suffered deprivation of a constitutionally protected property interest, the Court would dismiss the case because the complaints do not state a claim upon which relief may be granted.

Plaintiffs base their vagueness challenge on *Association of International Automobile Manufacturers, Inc. v. Abrams*,[25] which held that:

"The clarity of a statute that does not involve First Amendment freedoms is to be evaluated on an 'as applied' basis. A civil statute is not impermissible under this standard unless its commands are 'so vague and indefinite as really to be no rule or standard at all.' The degree of vagueness permitted varies with the nature of the enactment and the correlative needs for notice and protection from unequal enforcement ... [Its terms must] be construed by the State in a way that permits compliance and even-handed enforcement."[26]

---

**19.** 610 F.2d 1148 (3d Cir.1979).

**20.** *Id.* at 1156.

**21.** *See Yale Auto Parts, Inc. v. Johnson*, 758 F.2d 54, 60 (2d Cir.1985).

**22.** 762 F.2d 753 (9th Cir.1985).

**23.** *See Contractors Against Unfair Taxation Instituted on New Yorkers*, 1994 WL 455553, at *3.

**24.** *Klos v. Haskell*, 48 F.3d 81, 87 (2d Cir.1995).

**25.** 84 F.3d 602 (2d Cir.1996).

**26.** *Id.* at 614 (quoting *Boutilier v. INS*, 387 U.S. 118, 123, 87 S.Ct. 1563, 1566, 18 L.Ed.2d 661 (1967)); *see Thomas v. City of New York*, No. 97 Civ. 2156(JSM), 1997 WL 282211, at *5 (S.D.N.Y. May 28, 1997) ("Vagueness challenges

The difficulty with their position is that plaintiffs do not claim that the Rules in question—Sections 4–08(k)(2), 4–08(a)(4), and 4–08(k)(6)—are facially vague. Rather, they argue that ambiguities in the internal Police Department and DOT enforcement guidelines and the fact that the those agencies employed different enforcement guidelines regarding the issuance of tickets to vehicles parked in CD zones rendered the enforcement policies, as distinct from the Rules, void for vagueness.

■ The first problem with plaintiffs' argument is that the DOT and Police Department policies are " 'merely . . . internal guideline[s] for exercise of prosecutorial discretion, not subject to judicial review.' " [27] Internal prosecutorial standards may not serve as the basis for substantive or procedural claims, a rule founded at least in part on the view that agencies should not be discouraged from establishing internal guidelines.[28] Accordingly, plaintiffs may not predicate a vagueness claim on the NYPD or DOT standards.[29]

■ Furthermore, even if plaintiffs' vagueness claim properly might be grounded on internal prosecutorial standards, the policies at issue are not contradictory, and plaintiffs undoubtedly are able to comply with all three of them. Commercial parkers are on notice that they are at risk of being ticketed if no loading or unloading is observable at the vehicle. The fact that the DOT gives commercial vehicles a 30–minute grace period does not subject parkers to inconsistent dictates.[30] Moreover, it is appropriate to consider the "practicalities encountered by . . . agencies in administering legislative programs." [31] The reasons for the existence of the slightly different enforcement policies is easily discerned. The Police Department, whose officers are highly trained and for whom ticketing is only one of many important responsibilities, allowed its officers to use discretion and flexibility. The DOT, whose TEAs are not expected to concentrate on duties beyond ticketing and are not trained as rigorously, required its personnel to employ a more mechanical rule. The PVB, an adjudicatory body, was able to consider evidence not available to officers amid the bustle of street activity in making the final determinations as to whether the regulations in question had been violated, a calculation wholly consistent with but more thorough than the Police Department and DOT standards, which are designed to give guidance to officers who necessarily act with limited information. Because it was entirely possible for plaintiffs to regulate their conduct so as to avoid being ticketed under any of the enforcement guidelines and because each of those policies reflected the reality in which the agency that promulgated it operated, the Court would dismiss plaintiffs' vagueness claim even if a property interest were implicated and enforcement policies were an appropriate focus of attack.[32]

---

to statutes outside the First Amendment are nearly impossible.").

**27.** *Walker v. Reno*, 925 F.Supp. 124, 133 (N.D.N.Y.1995) (quoting *United States v. Ng*, 699 F.2d 63, 71 (2d Cir.1983)).

**28.** *United States v. Snell*, 592 F.2d 1083 (9th Cir.), *cert. denied*, 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979); *Walker*, 925 F.Supp. at 134.

**29.** *Georgia Pacific Corp. v. OSHRC*, 25 F.3d 999 (11th Cir.1994), upon which plaintiffs place significant emphasis, is not to the contrary. *Georgia Pacific* emphasized the need to give those affected by a regulation "fair warning of the conduct it prohibits or requires . . . [W]here [an agency] is unable to settle upon a single definition of a critical term or phrase of its own regulation . . . [it] is unconstitutionally vague as applied . . ." *Id.* at 1005. But the conduct prohibited here is only that which results in a finding of guilty in the PVB, which is the only agency that adjudicates alleged violations of the parking regulations. It has adopted single and consistent definitions of all of the key terms at issue.

**30.** *See, e.g., Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991) (different reasonable interpretations of same regulation by different agencies upheld).

**31.** *Kraebel v. New York City Dep't of Housing Preservation and Development*, 959 F.2d 395, 406 (2d Cir.), *cert. denied*, 506 U.S. 917, 113 S.Ct. 326, 121 L.Ed.2d 245 (1992).

**32.** Plaintiffs make several additional and equally unpersuasive arguments.

First, they claim that the City has failed to disseminate its parking policies as required by Section 1043 of the New York City Charter. As this cause of action does not appear in the complaint, the Court does not consider it; there is no excuse for a failure to assert the claim earlier in view of the fact that the current pleading is the fourth amended complaint. In any case, the Court does not regard the

### Substantive Due Process

Plaintiffs argue that the City's enforcement standards violate their substantive due process rights as they are not rationally related to the stated goal of the City's Traffic Rules and Regulations—providing commercial parking while minimizing the detrimental effect on the flow of traffic. They contend that there is no rational relationship between the observation period policies of DOT and the Police Department in determining whether a vehicle was parked illegally in a No SETLU and, in the case of DOT, No Parking zone and the criteria that determine legality—whether the vehicle was parked "for the purpose of expeditiously making pickups, deliveries or service calls." or parked "temporarily for the purpose of and while expeditiously . . . loading or unloading property to or from the curb." Similarly, they argue that there is no rational relationship between whether a vehicle was legally parked in a No Parking zone—whether it was "expeditiously . . . loading or unloading property to or from the curb"—and the Police Department policy of permitting ticketing whenever an officer failed to observe loading or unloading.

Like the procedural due process claim, the substantive due process claim must be dismissed both because plaintiffs lack a property interest on which to base their claim and because internal prosecutorial guidelines are not subject to judicial review. In any case, however, the claim fails on the merits.[33]

" '[T]he guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the objective sought to be attained.' "[34] "[T]he burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.' "[35] The standards governing substantive due process challenges such as this one. moreover, only recently have been clearly restated by the Second Circuit. In *Beatie v. City of New York*,[36] the Court reiterated that as long as a legislative or administrative determination does not "burden fundamental rights or single out suspect classifications," the judgment will be respected unless "those challenging [it] . . . convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker."[37] In other words, as long as the City officials responsible for the enforcement guidelines reasonably might have conceived that the policies would serve legitimate interests, those guidelines must be sustained.

The very statement of plaintiffs' substantive due process claim virtually refutes the attack. Although one readily can imagine circumstances in which a vehicle might be parked without observable activity and yet

---

ticketing guidelines, as distinct from the Rules themselves, as subject to the Charter provision relied upon.

Second, plaintiffs assert that they have been unable to clarify the circumstances in which they will be ticketed, a contention eviscerated by the plaintiffs' papers, which spell out in great detail exactly what the policies in question are.

Finally, plaintiffs allege that defendants have failed adequately to train TEAs in violation of *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). To establish a failure to train claim, plaintiffs must establish "that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir. 1992), *cert. denied*, 507 U.S. 961, 113 S.Ct. 1387, 122 L.Ed.2d 762 (1993). As none of plaintiffs' constitutional rights has been infringed, the claim fails. *See Contractors Against Unfair Taxation Instituted on New Yorkers*, 1994 WL 455553, at *10.

**33.** Contrary to the City's assertion, the Court has not ruled on the issue previously. It dismissed only plaintiffs' malicious prosecution claim to the extent it was grounded on substantive due process. *Caution*, 898 F.Supp. at 1071.

**34.** *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 84, 100 S.Ct. 2035, 2042, 64 L.Ed.2d 741 (1980) (quoting *Nebbia v. New York*, 291 U.S. 502, 510–11, 54 S.Ct. 505, 506, 78 L.Ed. 940 (1934)).

**35.** *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 728, 104 S.Ct. 2709, 2717, 81 L.Ed.2d 601 (1984) (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976)).

**36.** 123 F.3d 707 (2d Cir.1997).

**37.** *Id.* at 712 (quoting *Vance v. Bradley*, 440 U.S. 93, 111, 99 S.Ct. 939, 949, 59 L.Ed.2d 171 (1979)).

be employed in an expeditious pickup, delivery or service call, it is far from irrational to conclude that there is reasonable cause to believe that a vehicle sitting idle in a No Parking or No SETLU zone is not so engaged.

Nor are plaintiffs helped by their focus on their allegation that 85 percent of the summonses issued to their vehicles have been dismissed, as their focus is far too narrow. The parking regulations and enforcement policies at issue apply to all commercial vehicles in the City; they were not—and need not have been—designed for these plaintiffs. Government action "need not be rationally related to a legitimate governmental purpose as it applies to each individual. It is enough that [the decisionmaker] rationally might conclude that the statute [or policy], with all its imperfections, would serve a legitimate goal." [38]

Further, while it is unnecessary for the City to prove the rationality of its policies— as the issue is what reasonably might have been conceived rather than what the evidence would show [39]—the evidence, were it material, clearly would support the City. Less than one third of all summonses issued to commercial vehicles were contested in 1994 and 1995, and over half of those contested were upheld.[40] Thus, over 80 percent of the, relevant parking summonses issued to commercial vehicles under the allegedly irrational enforcement policies resulted in determinations of guilt.

For all of the foregoing reasons, plaintiffs' substantive due process challenge to the enforcement policies is without merit.

### Malicious Prosecution

██ Plaintiffs allege also that the tickets issued to their vehicles in CD zones and residential areas that resulted in not guilty determinations were the products of malicious prosecution.[41] Although defendants make a number of potentially dispositive arguments with respect to this claim, the Court need focus only on one.

Assuming *arguendo* that a constitutional tort analogous to malicious prosecution exists,[42] that it may be premised on the issuance of a parking ticket which arguably is civil in nature,[43] and that plaintiffs' claim is not barred by *Parratt v. Taylor*[44] and its progeny, plaintiff nevertheless would be obliged to show: "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." [45]

Plaintiffs have not sought to show that probable cause was lacking in any particular instance. Rather, they rest on the assertion that the City policies at issue fell short of establishing probable cause as evidenced by the large proportion of the tickets that plaintiffs themselves successfully sought. They fail, however, to refute the City's evidence that (1) the vast majority of commercial sum-

---

**38.** *Abreu v. Callahan,* 971 F.Supp. 799, 820 (S.D.N.Y.1997).

**39.** *Id.* at 820–21.

**40.** Brennan Aff. Ex. Y.

**41.** Plaintiffs' assertion that the Court "has, to a considerable extent, already considered and rejected the City's arguments" regarding the malicious prosecution claim in the previous litigation has no basis. The Court held only that "plaintiffs [are entitled] to prove, if prove they can" that they have satisfied the *Zinermon* test and have stated a claim for malicious prosecution.

**42.** Such a claim cannot be grounded on substantive due process. *Singer v. Fulton County Sheriff,* 63 F.3d 110 (2d Cir.1995), *cert. denied,* — U.S. ——, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996).

**43.** *See Easton v. Sundram,* 947 F.2d 1011, 1018 (2d Cir.1991), *cert. denied,* 504 U.S. 911, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992) (civil malicious prosecution normally does not give rise to constitutional tort); *Caution,* 898 F.Supp. at 1072 n. 7 (observing in *dictum* that New York would regard the issuance of parking tickets as a sufficient basis for bringing a malicious prosecution claim although not deciding whether such a claim would be cognizable under Section 1983).

**44.** 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

**45.** *Murphy v. Lynn,* 118 F.3d 938 (2d Cir.1997); *Cook v. Sheldon,* 41 F.3d 73, 79 (2d Cir.1994); *Caution,* 898 F.Supp. at 1072.

monses issued are uncontested, and (2) of those actually adjudicated between 1993 and 1995 on the basis of defenses of expeditious delivery or service call, only 44 percent were dismissed.[46]

New York law [47] defines probable cause as "the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of." [48] Given the obvious rational connection between the enforcement guidelines noted above and the Rules at issue and the fact that the overwhelming majority of summonses issued to commercial vehicles under those guidelines that result in guilty determinations, there simply is no genuine issue of material fact as to the lack of probable cause.

Plaintiffs fail also to raise an issue as to the existence of malice. "Under New York law, malice does not have to be actual spite or hatred, but means only 'that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.'" [49] Plaintiffs have adduced evidence of pressure from various City agencies on the DOT to increase the volume of tickets issued in New York City. They fail, however, to tie this pressure to their claims in any way. Plaintiffs have offered no evidence that the ticketing policies at issue were promulgated as a result of this pressure or that tickets were issued improperly in response to this pressure. In fact, the evidence shows a consistent refusal by the DOT to institute ticketing procedures that would lead to the improper issuing of summonses.[50]

As plaintiffs have failed to raise genuine issue of material fact as to the existence of malice or the lack of probable cause, their malicious prosecution claims are dismissed.

*Appellate Policies of the PVB*

Plaintiffs challenge the constitutionality of two aspects of the PVB's appellate policies. First, plaintiffs assert that the requirement that appellants attach proof of payment of the ticket to the notice of appeal routinely results in the denial of the right to appeal. The time for filing an appeal is 30 days from an adverse judgment and, plaintiffs allege, it often is impossible, due to the amount of time it takes to receive proof of payment from the PVB, to obtain the required receipt within 30 days.

The conditioning of an appeal on the posting of a bond undeniably is constitutional.[51] Furthermore, the PVB extends automatically the time in which to file an appeal to 90 days, it accepts cashiers receipts as well as canceled checks as proof of payment, and it processes appeals so long as the PVB's records indicate that payment has been received, which is usually within two days of receipt of payment.[52] Plaintiffs make no response to these arguments. Because the City has demonstrated that plaintiffs are not denied their right to appeal, defendants are entitled to summary judgment dismissing this claim.

Both sides move for summary judgment on the second PVB appellate procedure at issue. It is undisputed that the PVB's appellate division takes the money owed to appellants who successfully contest summonses and applies the released funds to outstanding summonses before returning the excess, if any.[53] Plaintiffs contend that this policy denies them their right to property—*viz.* their released funds—without due process of law. Defendants contend that the process afforded by the post-deprivation hearings ultimate-

---

**46.** Brennan Aff. Ex. Y.

**47.** Assuming that malicious prosecution in a case like this is actionable under Section 1983, the elements of the cause of action follow state law. *Cook*, 41 F.3d at 79.

**48.** *Rounseville v. Zahl*, 13 F.3d 625, 629 (2d Cir.1994) (quoting *Pandolfo v. U.A. Cable Systems of Watertown*, 171 A.D.2d 1013, 1013, 568 N.Y.S.2d 981, 982 (4th Dep't 1991)).

**49.** *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir.1996) (quoting *Nardelli v. Stamberg*, 44 N.Y.2d 500, 502–03, 406 N.Y.S.2d 443, 445, 377 N.E.2d 975 (1978)).

**50.** *E.g.,* Berman Opp. Aff. Ex. 6.

**51.** *Saharoff v. Stone*, 638 F.2d 90 (9th Cir.1980).

**52.** Phillips Aff. ¶¶ 1–15.

**53.** *Id.* ¶¶ 18–20.

ly provided in the PVB on the outstanding summonses satisfies constitutional strictures.

■■■■ No constitutional interests are implicated by the application of refunds due to plaintiffs to outstanding summonses which are overdue. Plaintiffs' failure to contest those summonses is equivalent to a guilty plea. Plaintiffs do, however, have a property interest in funds released that are applied to satisfy summonses that plaintiffs are challenging or planning to challenge. The question therefore is whether the seizure of funds to satisfy summonses issued but not yet adjudicated violates procedural due process.

*Mathews v. Eldridge* [54] establishes the basic framework for determining whether administrative procedures denying pre-deprivation hearings are constitutionally sufficient: "[C]onsideration of three distinct factors [is proper]: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." [55]

Plaintiffs' interest—possession of funds released by the reversal of summonses on appeal until the summonses against which the funds are offset are adjudicated—is far from vital. It consists entirely of the right to hold moderate sums of money for short periods of time. The risk of erroneous deprivation—that is, the risk that the unadjudicated outstanding summons against which a refund is applied will result in a not guilty determina-

tion—is modest. [56] The City's interest—ensuring that summonses are paid and avoiding the substantial administrative burdens of issuing a check only to have to re-collect the fine if an unadjudicated outstanding summons is upheld—is considerable, far outweighing plaintiffs' interest. Indeed, the Supreme Court has held that the need for a pre-deprivation hearing is outweighed by the government's interest in revenue raising through effective tax collection even if, as is not the case here, the taxpayer may be placed "in a precarious financial position." [57] Accordingly, the Court holds that the PVB's appellate policy does not violate plaintiffs' due process.

### Conclusion

For the foregoing reasons, defendants' motions for summary judgment dismissing the complaints is granted in all respects. Plaintiffs' motions for partial summary judgment are denied in all respects.

SO ORDERED.

---

**54.** 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

**55.** *Id.* at 334–35, 96 S.Ct. at 903; *see Perales v. Reno,* 48 F.3d 1305, 1313 (2d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 699, 133 L.Ed.2d 657 (1996).

**56.** The statistics available to the Court are incomplete but do demonstrate that of the 1,410,-388 commercial summonses issued in fiscal 1994–1995, 189,549 were adjudicated, with 41 percent leading to dismissal. Thus, City-wide *fewer than 6 percent of all commercial summonses were dismissed.*

**57.** *Bob Jones University v. Simon,* 416 U.S. 725, 747, 94 S.Ct. 2038, 2051, 40 L.Ed.2d 496 (1974), *overruled on other grounds, South Carolina v. Regan,* 465 U.S. 367, 104 S.Ct. 1107, 79 L.Ed.2d 372 (1984). Although the governmental interest in tax collection is arguably stronger than its interest in collecting fines, the balancing of the *Mathews* factors is similar as the taxpayer's interest in *Bob Jones* in maintaining tax exempt status was also substantially greater than that of the plaintiffs at bar.